## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

ASSOCIATES IN MEDICAL
TOXICOLOGY, P.C. and PHILIP W.
MOORE,

            Plaintiffs,

v.

EMOGENE RENEA SNYDER and
MIGLIORE TREATMENT SERVICES,
LLC,

            Defendants.

Case No:

## COMPLAINT

Now come Plaintiffs, Associates in Medical Toxicology, P.C. and Philip W. Moore, DO, by and through undersigned counsel, and aver the following:

## I.  PARTIES

1.  Plaintiff, Associates in Medical Toxicology, P.C. ("AMT"), is a Pennsylvania corporation with its corporate headquarters located at 207 House Avenue, Suite 102, Camp Hill, Pennsylvania 17011.

2.  Plaintiff, Philip W. Moore, DO ("Dr. Moore"), resides in Mechanicsburg, Pennsylvania, and is the founder and Chief Executive Officer of AMT.  Prior to his resignation on May 3, 2019, Dr. Moore was also the Medical Director of Migliore Treatment Services, LLC.

3.  Defendant, Migliore Treatment Services, LLC ("Migliore") is a Pennsylvania organized limited liability company with its principal place of business at 60 South 41st Street, Harrisburg, Pennsylvania 17111.

4.  Defendant, Emogene Renea Snyder ("Ms. Snyder"), resides in Harrisburg, Pennsylvania, and is the founder and Chief Executive Officer of Migliore and, at all times

relevant to this Complaint, Ms. Snyder managed the day to day operations of Migliore. For a time, Ms. Snyder was also the Director of Clinical Operations at AMT.

## II. JURISDICTION AND VENUE

5.    This Court has federal jurisdiction pursuant to 28 U.S.C. § 1331 and the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(1)-(7).

6.    Personal Jurisdiction over Ms. Snyder and Migliore is proper. Ms. Snyder was a full time AMT employee, and received salary and benefits from AMT. Furthermore, Ms. Snyder committed the illegal acts and omissions set forth in this Complaint.

7.    Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims occurred in this District.

## III. BACKGROUND

### A.    Philip W. Moore and Emogene Renea Snyder's Personal and Professional Relationships

8.    From 2012 through 2016, Dr. Moore was a hospitalist and program physician at the University of Pittsburgh Medical Center Pinnacle ("Pinnacle") in Harrisburg, Pennsylvania.

9.    Dr. Moore has been a fellow of the American Society of Addiction Medicine and an active member of the Addiction Subsection of the American College of Medical Toxicology.

10.    As a toxicology expert, Dr. Moore has published numerous articles and book chapters and has spoken locally and nationally regarding topics in medical toxicology and addiction.

11.    From 2014 through 2015, Dr. Moore provided free addiction services to people in central Pennsylvania.

12.    In or about July 2015, Dr. Moore established AMT in order to provide preventative toxicology and addiction services for outpatients. AMT quickly became a

successful medical practice in the Harrisburg area with numerous patients visiting the practice every day. Dr. Moore was and remains the sole shareholder of AMT.

13. Ms. Snyder is a counselor and worked as a drug and alcohol program manager at the Pennsylvania Department of Corrections from 2003 thru 2016.

14. On or about April 14, 2016, Ms. Snyder and her former husband, Corey Lingenfelter, established the addiction treatment facility, Migliore. Ms. Snyder is a Manager and the Chief Executive Officer and has at least 50% ownership interest in Migliore.

15. In or about the summer of 2016, Dr. Moore met Ms. Snyder through a mutual contact at the Drug and Alcohol Program for Dauphin County, Pennsylvania.

16. Dr. Moore and Ms. Snyder became romantically involved, and Ms. Snyder became pregnant with their daughter E.M. E.M. was born on July 3, 2017. On June 5, 2018, Dr. Moore and Ms. Snyder moved into a house together that Dr. Moore had purchased.

17. Very early on in their relationship, Ms. Snyder became very controlling of Dr. Moore's personal and professional lives. She began to dictate his career path and make decisions on his behalf, purportedly in his own best interest.

18. Ms. Snyder claimed that she attended law school at some point in time and that she had the necessary background and skill to draft legal documents and advise Dr. Moore with regard to his business, including for compliance.

19. Ms. Snyder is not a licensed legal practitioner. She attended one or two semesters of law school, but never graduated from law school or passed any state bar examination.

20. In or about the summer of 2016, Ms. Snyder proposed that Dr. Moore quit his job at Pinnacle and that he focus full time on AMT.

3

21.   Ms. Snyder promptly drafted Dr. Moore's resignation letter and urged him to sign and submit it to his employer.  Dr. Moore trusted Ms. Snyder and followed her advice.

22.   If it had not been for Ms. Snyder's persistence, Dr. Moore would have continued his employment with Pinnacle.

23.   Upon information and belief, it was Ms. Snyder's intention to benefit from AMT's reputation and gain access to its numerous patients to benefit herself and Migliore.

**B.    Collaboration between AMT and Migliore**

24.   On or about August 23, 2016, AMT and Migliore entered into at least two Memoranda of Understanding ("MOU") for the purpose of establishing a collaboration between the businesses.

25.   Ms. Snyder drafted the MOUs.

26.   Dr. Moore did not seek legal advice prior to executing either MOU because he trusted Ms. Snyder, and she had assured him that she was competent and trustworthy to protect him.

27.   Pursuant to the MOUs, AMT agreed to provide onsite medical assistance treatment to clients of Migliore, and Migliore agreed to provide intensive outpatient treatment and outpatient treatment services to clients diagnosed by Dr. Moore with the disease of addiction.

28.   On or about August 23, 2016, Dr. Moore became the Medical Director for Migliore.  At some point thereafter, Ms. Snyder also named him Chief Operating Officer ("COO") for Migliore; however, the COO position was purely as a figurehead as Ms. Snyder at all times managed the day-to-day affairs of Migliore.

29.     Throughout the duration of AMT and Migliore's collaboration, the two companies became so intertwined that they factually operated as one business.  Specifically:

a.      Ms. Snyder and Dr. Moore operated both businesses from the same location at 60 South 41st Street, Harrisburg, Pennsylvania 17111, pursuant to a sublease between AMT as the subtenant and Migliore as the prime tenant;

b.      AMT and Migliore shared the same computer system, electronic billing system, telephone lines, internet network, and e-mail server;

c.      Several AMT and Migliore employees had employment contracts with both businesses;

d.      Several AMT and Migliore independent contractors had contracts with and provided services to both companies;

e.      AMT and Migliore employees were on AMT payroll and the Migliore independent contractors were also paid by AMT, as part of Dr. Moore's and AMT's financial support of Migliore;

f.      AMT and Migliore employees received benefits through AMT;

g.      AMT and Migliore provided services to many of the same patients;

h.      Ms. Snyder ran the day-to-day operations for both AMT and Migliore; and

i.      AMT employees considered Ms. Snyder and Dr. Moore to be equally in charge with respect to AMT's operations.

30.     In or about March 2019, Ms. Snyder ended her personal relationship with Dr. Moore and decided to also end their business relationship.

31.     In or about March 2019, Ms. Snyder and Dr. Moore engaged separate counsel and began negotiations regarding the separation of the two businesses.

C.     **Emogene Renea Snyder's Fraudulent Conveyance of Ownership of Migliore, LLC to Philip W. Moore**

32.     On or about August 23, 2016, Ms. Snyder purported to "transfer" a 25% ownership interest in Migliore to Dr. Moore; however, Dr. Moore subsequently determined that none of the conditions precedent to transferring ownership required by Migliore's Operating Agreement had been met.

33.     On or about November 17, 2016, Mr. Lingenfelter purported to "transfer" his 50% ownership of Migliore to Ms. Snyder. The purported "transfer" occurred without execution of the proper documents in conformance with the requirements of the Operating Agreement and without compliance with the conditions precedent to transfer of ownership.

34.     Mr. Lingenfelter "transferred" his ownership interest by merely entering into a Marriage Settlement Agreement ("MSA") with Ms. Snyder in which Ms. Snyder agreed to pay Mr. Lingenfelter the amount of $96,000 in exchange for his ownership interest. Execution of this MSA alone was insufficient to transfer ownership of Migliore to Ms. Snyder.

35.     The payments by Ms. Snyder to Mr. Lingenfelter of $2,000 monthly for a period of four (4) years were to commence on July 1, 2017.

36.     The purported "transfer" of ownership to Dr. Moore in August, 2016 is further refuted by Migliore's federal and Pennsylvania State returns, as filed, for which the K-1s list Ms. Snyder and Corey Lingenfelter as each having 50% ownership. Dr. Moore was not shown as being an owner of Migliore in any percentage.

37.     Migliore's Operating Agreements provide in pertinent part, "[a] Member shall not at any time transfer its Membership Interest except in accordance with the conditions and limitations established and contained within the Section regarding 'Restrictions on Transfer of

Membership Interests.'"  The Migliore Operating Agreements executed on January 18, 2017 and

August 23, 2016 are attached hereto as Exhibit A.

38.    In January 2017, Ms. Snyder purported to "transfer" an additional ownership

interest to Dr. Moore sufficient to increase his ownership interest in Migliore to 51%; again

however, none of the conditions precedent to transfer of ownership required by Migliore's

Operating Agreement had occurred and the purported 2017 "transfer" was thus also ineffective.

39.    By way of her fraudulent "transfers" of ownership in Migliore to Dr. Moore, Ms.

Snyder induced Dr. Moore to make large injections of capital into Migliore over the course of

several years.  This includes Dr. Moore and AMT lending $200,000 in January 2019 to Migliore

-- immediately before Ms. Snyder ended both her personal and professional relationships with

Dr. Moore, but right after she formed, as the sole owner, Migliore Institute of Behavioral

Sciences (the entity to which she transferred Migliore assets).  Ms. Snyder used the $200,000 to

fund Migliore payroll and operation-related expenses between January 2019 and April 2019.

40.    Mr. Lingenfelter was not a party to the MOUs and was not involved in the

negotiations between Ms. Snyder and Dr. Moore.

41.    Ms. Snyder, for her own benefit, falsely and fraudulently portrayed to Dr. Moore

that she was the sole owner of Migliore and in a position to transfer substantial ownership of

Migliore to Dr. Moore and, "but for" Ms. Snyder's deceit, Dr. Moore would not have invested

significant capital in Migliore to his financial detriment.

**D.    Emogene Renea Snyder's Mismanagement of AMT Operations**

42.    During the process of separating the two businesses, Dr. Moore uncovered a

number of irregularities in AMT's operations due to Ms. Snyder's mismanagement and

intentional wrongdoing.

7

43.     In addition to the collaborative practice between Migliore and AMT, on December 10, 2016, Ms. Snyder entered into an employment agreement with AMT effective January 7, 2017, to serve as AMT's Clinical Supervisor.  That employment agreement was drafted by Ms. Snyder.  The employment agreement is attached hereto as Exhibit B.

44.     As the Clinical Supervisor of AMT, Ms. Snyder was responsible for overseeing and developing AMT's day-to-day operations, including, but not limited to, office management, policies and procedures, human resources, insurance, billing and coding.

45.     Because of Migliore's and AMT's intertwined operations, Ms. Snyder was not only an employee, but a *de facto* officer of AMT.  As such, Ms. Snyder acted as an agent of AMT and owed AMT the duties of loyalty, good faith and fair dealing in performing her duties.

46.     Ms. Snyder failed to comply with her duties by negligently and/or intentionally mismanaging AMT's operations.  Examples of such mismanagement are:

a.     Ms. Snyder falsified AMT bills and submitted them to various billing companies for services provided by Migliore;

b.     When Dr. Moore was not in the office, Ms. Snyder pretended to "cover for" Dr. Moore and prescribed uncontrolled medications to patients for which she was not authorized to prescribe;

c.     Ms. Snyder failed to document patient encounters;

d.     Ms. Snyder granted access to AMT's locked medication storage room to a number of AMT employees absent Dr. Moore's knowledge or approval;

e.     Ms. Snyder added E.M.'s personal nanny to the combined AMT/Migliore payroll absent Dr. Moore's knowledge or approval;

f.      Ms. Snyder unilaterally changed employment contracts between AMT and its employees, including her own employment contract;

g.      Ms. Snyder unilaterally created and changed legal documentation thereby creating incomplete and/or conflicting documents;

h.      Ms. Snyder purchased costly marketing materials despite Dr. Moore's explicit directions not to do so;

i.      Ms. Snyder reimbursed herself for personal expenses, unrelated to the business;

j.      Ms. Snyder did not supervise or provide proper training to AMT employees; and

k.      Ms. Snyder was rarely present in the offices and failed to properly respond to staffing needs.

47.     Ms. Snyder's actions caused significant harm to AMT and to Dr. Moore.

**E.      Emogene Renea Snyder's Harmful Actions against Philip W. Moore**

48.     On March 30, 2019, Ms. Snyder informed Dr. Moore that she was ending her personal relationship with him and moving out of Dr. Moore's residence.  Ms. Snyder proceeded to throw Dr. Moore's personal items in the house and damage walls and doors.

49.     On or about March 27, 2019, Ms. Snyder forced entry into Dr. Moore's file cabinet and removed all AMT records which Dr. Moore had in storage.

50.     Upon making the decision to break ties with Dr. Moore personally and professionally, Ms. Snyder made it her mission to completely destroy Dr. Moore's career, business, reputation, and his relationship with his daughter.

51.     On April 8, 2019, Ms. Snyder sent an unprovoked text message to Dr. Moore stating the following: "You are a fuckin piece of shit and I have been made aware of your games. Caught ya.  Enemy lines have been drawn and the war is to begin.  Good luck mother fucker. You are nothing to me."

52.     In or around April 2019, Ms. Snyder began to contact several federal and state authorities, including the Pennsylvania Office of the Attorney General, the Pennsylvania Department of State, the Centers for Medicare & Medicaid Services, the Pennsylvania Insurance Department, and The Drug Enforcement Administration ("DEA") and made false allegations against Dr. Moore and AMT frivolously causing these entities to initiate investigations.  Ms. Snyder also contacted several insurance companies and made false reports about billing irregularities by Dr. Moore and AMT.  Lastly, Ms. Snyder also contacted Pinnacle alleging compliance violations by Dr. Moore.

53.     Upon information and belief, Ms. Snyder initiated these reports to cause the Pennsylvania Department of State to revoke Dr. Moore's medical license and mislead federal and state authorities into investigating and/or criminally prosecuting Dr. Moore.  On at least one occasion, Ms. Snyder told former AMT employees that this was her intention.

54.     Other examples of harmful actions Ms. Snyder undertook against Dr. Moore and AMT are:

a.     Ms. Snyder locked Dr. Moore out to prevent him from having access to a safe containing controlled substances which belonged to AMT and for which Dr. Moore was responsible;

b.     Ms. Snyder destroyed important AMT files, including, but not limited to, inventory records, medication dispensing records and audit records.  She later falsely reported to

the DEA and the Attorney General's Office that Dr. Moore does not maintain these required records at AMT;

      c.    Ms. Snyder contacted AMT's billing service provider, JD Infolabs Consulting LLC, and claimed that AMT had abandoned patient care and defaulted on its sublease at 60 S 41st Street. She then asked to remove all AMT billing and affiliation with contracts from this address immediately;

      d.    Before AMT moved to its new location, Ms. Snyder sent an email to AMT's billing company falsely claiming that AMT was no longer practicing at 60 S 41st Street, despite the existence of a valid sublease;

      e.    Before AMT moved to its new location, Ms. Snyder unilaterally changed the locks to the building at 60 S 41st Street;

      f.    Ms. Snyder sent a mass email to AMT patients stating that they could no longer see Dr. Moore because Migliore and AMT were no longer affiliated or because AMT was no longer operative;

      g.    Ms. Snyder referred AMT patients to other medical providers without the patients' knowledge or consent;

      h.    Ms. Snyder urged AMT patients to file reports and/or medical malpractice lawsuits against Dr. Moore and/or AMT;

      i.    Ms. Snyder broke into AMT's offices at 207 House Avenue and removed personal property as well as AMT's entire Cannabidiol ("CBD") inventory;

      j.    Ms. Snyder hacked into AMT employees' email accounts and deleted all emails because she alleged that Dr. Moore was attempting to steal her CBD business;

k.     Ms. Snyder contacted AMT's CBD representatives for Henning Trading Company, MedTerra and Zilis, and notified them that she does not permit them to sell their products to AMT.  When the CBD representative for Henning Trading Company refused to follow her direction, Ms. Snyder repeatedly called his boss and complained about the representative, falsely claiming that he is using medical marijuana; that he hosted a party at his boss' home when he was house sitting for him; that he dresses unprofessionally; that he uses excessive amounts of CBD; and that he is dealing privately with AMT;

l.     Ms. Snyder declined to permit AMT and Migliore's certified public accountants to allocate expenses for shared facilities that were initially funded 100% by AMT and by oral agreement were to be shared.  Ms. Snyder then proceeded to assert that Migliore owned the facilities/property for which she declined to reimburse AMT and then proceeded to sell the property at "yard sales" and on the Internet;

m.     Ms. Snyder contacted AMT's communications provider, RingCentral, and changed the account information to falsely represent herself as the billing representative for AMT.  After doing so, Ms. Snyder then disconnected all of AMT's phone and fax lines, thereby preventing patients, insurance carriers, vendors, suppliers and others from contacting AMT;

n.     Ms. Snyder hacked into AMT's cloud-based electronic health record platform, Practice Fusion, to access confidential AMT patient files and unlawfully utilized that confidential patient information to the detriment of the patients and Dr. Moore;

o.     Ms. Snyder hacked into AMT's RingCentral account and diverted all of AMT's phone and fax lines to Migliore.  As a consequence of Ms. Snyder's action, AMT patients were unable to contact Dr. Moore or any other AMT employees for many days.  Subsequently, at least one AMT patient relapsed and used heroin;

p.      Ms. Snyder attempted to gain access to AMT's software to obtain confidential company information using inappropriate credentials;

q.      Ms. Snyder has sent personal messages and published up to 40 public Facebook posts daily, falsely accusing Dr. Moore of being unethical, an alcoholic, a narcissist, a pedophile, a rapist, a drug user, and a psychopath. Ms. Snyder is Facebook friends with many of Dr. Moore's patients who are able to see Ms. Snyder's false allegations;

r.      Ms. Snyder falsely accused Dr. Moore of physically abusing Ms. Snyder and their daughter;

s.      Ms. Snyder falsely claimed that Dr. Moore suffers from a personality disorder and drug and alcohol addiction;

t.      Ms. Snyder has published Facebook posts falsely claiming that AMT is a non-licensed drug and alcohol treatment provider;

u.      Ms. Snyder falsely told Guy and Micki Weaver, landlords of the building at 60 S 41st Street, that Dr. Moore physically abused her, that he has a personality disorder, and he abuses drugs and alcohol;

v.      Ms. Snyder created a hostile work environment for AMT staff;

w.      Ms. Snyder interrupted patient visits as well as audio-video telemedicine interactions with patients on a number of occasions by eavesdropping, entering offices and patient rooms unannounced, at times, forcing patients to exit the room, and yelling directly outside of patient rooms. Patients have complained to AMT staff about Ms. Snyder's inappropriate behavior;

x.      Ms. Snyder unilaterally terminated AMT employees, absent Dr. Moore's knowledge or approval;

y.     On May 14, 2019 and again on May 30, 2019, Ms. Snyder engaged Signarama to remove AMT signs from AMT's office location at 207 House Avenue. Consequently, Signarama employees removed AMT's exterior signs on May 31, 2019;

z.     Ms. Snyder asked AMT staff to sell her CBD products, and to produce invoices and other documents for her after the businesses separated;

aa.     Ms. Snyder disrupted office operations screaming at employees as well as Dr. Moore himself and slamming doors;

bb.     Ms. Snyder falsely told employees that Dr. Moore had destroyed the businesses and that he needed to tell the employees what he had done;

cc.     Ms. Snyder removed assets belonging to AMT and then sold them despite multiple requests from AMT for their return;

dd.     Ms. Snyder converted personal property belonging to AMT and/or Dr. Moore to her own use and benefit without privilege or license to do so;

ee.     Ms. Snyder sold computers owned by AMT which may have contained confidential medical records of patients;

ff.     Ms. Snyder has posed as Dr. Moore or recruited others to pose as Dr. Moore to secure products and/or services as though she were securing them for Dr. Moore and/or AMT;

gg.     Ms. Snyder has falsely stated on social media and in direct communications with patients that Dr. Moore has a sexually transmitted disease;

hh.     Ms. Snyder has communicated directly with patients of Dr. Moore that he has a personality disorder and is a drug addict and an alcoholic;

ii.     Ms. Snyder has repeatedly communicated directly with family members of Dr. Moore, despite their repeated requests that she stop doing so, falsely claiming that he is physically abusive, suffers from a personality disorder and is a drug addict and an alcoholic;

jj.     Ms. Snyder repeatedly copies representatives from the Pennsylvania Office of the Attorney General on emails she sends wherein she maligns Dr. Moore in an effort to cause the Office of the Attorney General to further investigate him and AMT;

kk.     Ms. Snyder contacted the Cumberland County Pennsylvania Commissioners, for whom Dr. Moore performs professional services, including testifying as an expert witness on causes of death, and falsely advised that he was not properly licensed or credentialed to perform the contracted services; and

ll.     Ms. Snyder has forged Dr. Moore's signature on multiple AMT documents.

55.     Furthermore, Ms. Snyder has repeatedly attempted to manipulate and intimidate Dr. Moore in order to further incapacitate him.  Examples of such behavior include:

a.     Ms. Snyder left literature in Dr. Moore's office and personal mailbox, such as a copy of People Magazine, dated April 1, 2019, with the headline "How We Make Our Marriage Work," with the handwritten note "maybe a good read for you!;" a printed copy of the AMA Code of Medical Ethics 2016, with the handwritten note "sometimes just a nice reminder!;"

b.     Ms. Snyder repeatedly sent text messages and initiated telephone calls to Dr. Moore telling him that he "looked nice today;" that she just wanted to talk to him; that he "was … drunk and put [his] hands on [her];" that he "hurt [their] family and business;" and that she wanted him "to come back so [she] could talk to [him] and hold [him]."  When Dr. Moore

15

did not respond to Ms. Snyder's bizarre and confused messages, she threatened to "call the police and have them do a wellness check on" him if he did not answer;

      c.     Ms. Snyder repeatedly sent Dr. Moore threatening messages falsely accusing Dr. Moore of having "emotional affairs" and "inappropriate interactions with [other] women." As a consequence, Ms. Snyder tracked Dr. Moore's cell phone;

      d.     Ms. Snyder filed a Protection from Abuse ("PFA") Complaint against Dr. Moore on May 2, 2019, alleging, among other abuse, that Dr. Moore physically assaulted her on January 2, 2019, by "punching, kicking, putting his knee into [her] back… and choking" her; however, on May 15, 2019, at the PFA Hearing she voluntarily withdrew the PFA and less than two weeks later over Memorial Day weekend, she sent multiple text message to Dr. Moore inviting him to spend the long holiday weekend with her and E.M. at a "camping site at laurel hill state park in Somerset;"

      e.     Ms. Snyder has repeatedly contacted Dr. Moore's friends and family and sent gifts to them in order to obtain information regarding Dr. Moore and AMT;

      f.     Ms. Snyder repeatedly contacted AMT employees and offered clothing for their children as well as birthday gifts to them in order to obtain information about Dr. Moore and AMT;

      g.     Only six days after filing the PFA and before she had withdrawn the PFA, Ms. Snyder sent an email to Dr. Moore asking him to go to a meeting with a trauma therapist with her so that Dr. Moore can "get a better understanding of [her], [her] needs, [her] triggers and how to communicate effectively with [her];" and

      h.     On May 12, 2019, Ms. Snyder sent an email to Dr. Moore, his family, and mutual friends, stating that he has "won whatever [he was] trying to accomplish," and that she

has "put in to remove the PFA order," and "will be closing Migliore doors" in the near future. She further stated that she prays that [he will] get through [his] disease of addiction" and "not let [his] disease or mental health issues take over and continue to destroy [him]."  Two days later, Ms. Snyder's attorneys confirmed that Ms. Snyder had not closed Migliore and had not withdrawn the PFA.

56.     Ms. Snyder's unstable and impulsive behavior negatively impacted Dr. Moore, his physical and emotional wellbeing, AMT, as well as AMT's patients and employees, not to mention their two-year old daughter, E.M.

57.     On May 2, 2019, Dr. Moore petitioned for full custody of his daughter E.M.  Ms. Snyder had not allowed Dr. Moore to see his daughter for at least nine weeks after Ms. Snyder unexpectedly picked E.M. up from her nanny on April 16, 2019.

58.     On May 3, 2019, Dr. Moore resigned from his positions as Medical Director and Chief Operating Officer for Migliore.

59.     On the same day, Dr. Moore terminated Ms. Snyder for cause as the Director of Clinical Operations for AMT stating that Ms. Snyder's disruption of business operations and interference with AMT's employees had proven detrimental to AMT's business.

60.     On May 15, 2019, representatives from the Pennsylvania Department of State, the Attorney General's Office, and the DEA came to AMT's offices to inspect the premises and conduct an interview with Dr. Moore upon Ms. Snyder's false allegations against Dr. Moore. Ms. Snyder falsely claimed, among other things, that Dr. Moore did not maintain any records with regard to medication dispensing or inventory of controlled substances.  These investigations have since been satisfactorily resolved, but caused tremendous interruptions in AMT's daily

business operations as Dr. Moore and AMT staff were unable to attend to their patients' needs, while responding to the regulatory agencies' time sensitive requests.

61.     On or about June 12, 2019, Ms. Snyder disappeared with E.M., with no notice to Dr. Moore, the day after a 7 year-old boy tragically drowned in her swimming pool while attending a graduation party for Ms. Snyder's son from a prior marriage.  Dr. Moore had no contact with or information about E.M., her physical and/or emotional condition or her whereabouts for more than one week.

62.     Ms. Snyder never advised Dr. Moore of the drowning, despite E.M. being present at the graduation party, and Dr. Moore only found out about the tragedy by hearing about it on the local news.

**F.     Emogene Renea Snyder's Abandonment of Migliore**

63.     On or about August 9, 2019, Ms. Snyder unilaterally and improperly withdrew from Migliore and stated that she had "transferred" her membership interests and rights to Dr. Moore.

64.     Immediately prior to doing so, Ms. Snyder sold or transferred Migliore's (and AMT's) assets to benefit herself and notified every creditor, employee, independent contractor, vendor, supplier, and others that Dr. Moore was the sole owner of Migliore and responsible for Migliore's debts, including a cash advance contract in the amount of $15,000.00 which Ms. Snyder secured for herself and Migliore on or about July 5, 2019, and defaulted on approximately two weeks later.

65.     On information and belief, Ms. Snyder even sold Migliore's trademark and recently obtained patent.

18

66.     Dr. Moore held no officer or management positions within Migliore since on or around May 3, 2019, and did not contract, co-sign, and/or guarantee payment for any services, products, or loans incurred by Migliore.

67.     Ms. Snyder also transferred Migliore's telephone lines, email accounts, website domain, beneficial contracts, and electronic health records to Migliore Institute of Behavioral Science, a separate drug addiction treatment facility Ms. Snyder established on February 2, 2019, in Harrisburg, Pennsylvania,

68.     Upon Ms. Snyder's pillage and subsequent abandonment of Migliore, Ms. Snyder simply left the facility located at 60 South 41st Street, leaving behind confidential patient information in boxes which the landlord, Micki Weaver, later discovered.

69.     Ms. Snyder also abandoned extensive training materials which she had ordered in compliance with a grant to Migliore from the Pennsylvania Commission on Crime & Delinquency ("P.C.C.D."). On information and belief, Migliore received the funds from P.C.C.D. to purchase the training materials, but never paid the vendors for the materials ordered or the training services rendered.

## Count I
### 18 U.S.C. § 1030
### Computer Fraud and Abuse Act
Associates in Medical Toxicology, P.C. and Philip W. Moore v. Emogene Renea Snyder

70.     The foregoing allegations are incorporated by reference.

71.     Since on or about March 2019, Ms. Snyder has willfully infringed AMT and Dr. Moore's rights related to their telephones, e-mail accounts, and other online accounts, including, but not limited to, accounts with AMT's billing company, RingCentral, patient survey tool, Qualtrics, Apple, and Practice Fusion (collectively "AMT computer services").

19

72.     Ms. Snyder acquired access to AMT computer services with the knowledge and intent to defraud, and gain unauthorized access to AMT computer services, which were all password protected to secure both patient records and confidential and proprietary information of AMT.  The purpose of this hacking, known as "unlocking," was to illegally gain access to confidential company information and disable AMT and Dr. Moore's access to their own services by making herself administrator of the accounts and by changing passwords and security questions.

73.     Ms. Snyder's conduct also exceeds authorized access, as defined by Section 1030(e)(6) of the Computer Fraud and Abuse Act, in that Ms. Snyder was initially permitted to access AMT computer services when she was employed by AMT.  Ms. Snyder's conduct of hacking into AMT computer services after her termination as an employee of AMT well exceeded her authorized access.

74.     By her actions, Ms. Snyder furthered her intended fraud and acquired information of value, not belonging to her.

WHEREFORE, Plaintiffs AMT and Dr. Moore respectfully request judgment in their favor and against Defendant Emogene Renea Snyder.

## Count II
### Intentional and Tortious Interference with Contract and With Prospective Contractual Relations

Associates in Medical Toxicology and Philip W. Moore v. Migliore Treatment Services and Emogene Renea Snyder

75.     The foregoing allegations are incorporated by reference.

76.     AMT and Dr. Moore have both existing and prospective relations with their patients and others.  They also have ongoing contractual relations with insurance companies, hospitals, and other businesses or non-profit organizations which act as both patient referral

sources and/or sources of payment for services, which contracts contemplate AMT and Dr. Moore rendering future services.

77.     Defendants have used the confidential information wrongfully taken from AMT to interfere intentionally and tortiously with Plaintiffs' existing and prospective contractual relations with their patients, vendors, suppliers, and other business partners.

78.     Defendants have supplied untrue and maligning information about both AMT and Dr. Moore to patients, providers, vendors, suppliers, and others in an effort to divert them away from AMT and Dr. Moore to the financial detriment of AMT and Dr. Moore.

79.     Defendants have directly contacted Plaintiffs' patients and directed them to other physicians/providers, several times sharing the patients' confidential medical records without prior authorization from the patients to do so.

WHEREFORE, Plaintiffs Associates in Medical Toxicology, P.C., and Dr. Philip W. Moore respectfully request judgment in their favor and against Defendant Emogene Renea Snyder and Migliore Treatment Services, LLC.

## Count III
### Breach of Fiduciary Duty, Duty of Fair Dealing and Duty of Loyalty

Associates in Medical Toxicology and Philip W. Moore v. Emogene Renea Snyder

80.     The foregoing allegations are incorporated by reference.

81.     During the period of her employment by AMT, Ms. Snyder acted as an agent of AMT and owed AMT and Dr. Moore the duties of loyalty, good faith and fair dealing in performing her duties, which are implied both in contract and law by the confidential nature of information entrusted to her and by her position within AMT.

82.     As described above, Ms. Snyder breached her fiduciary duties of loyalty, fair dealing and good faith owed to AMT and Dr. Moore by wrongfully misappropriating

21

confidential proprietary information; making false reports to governmental agencies with oversight of Dr. Moore's medical license and AMT; making false reports of unlawful billing by Dr. Moore and AMT; falsely asserting to the Cumberland County Commissioners that Dr. Moore is not properly licensed to provide the services to Cumberland County that he provides; tortiously and intentionally interfering with AMT's existing and prospective contractual relationships; and harming the professional reputations of AMT, and its business operations, as well as Dr. Moore, all to their financial detriment.

83.     Ms. Snyder's conduct in breaching her fiduciary duties to AMT was intentional, wanton, willful, and egregious, warranting an award of punitive damages.

84.     Ms. Snyder's breaches of fiduciary duties have harmed AMT and Dr. Moore, and AMT and Dr. Moore are entitled to recover damages for that harm, including punitive damages.

WHEREFORE, Plaintiffs Associates in Medical Toxicology, P.C., and Dr. Philip W. Moore respectfully request judgment in their favor and against Defendant Emogene Renea Snyder.

## Count IV
### Unlawful Attempted Monopolization in Violation of the Sherman Act
Associates in Medical Toxicology, P.C. and Philip W. Moore v. Emogene Renea Snyder

85.     The foregoing allegations are incorporated by reference.

86.     Ms. Snyder unlawfully attempted to monopolize the relevant market of the sale of CBD products by contacting AMT's CBD representatives and notifying them that she does not permit them to sell their products to AMT.

87.     Ms. Snyder's conduct had and continues to have an anticompetitive purpose and effect on competition, was not offset by any pro-competitive benefits, and was not the least restrictive means of achieving any pro-competitive benefits.

88.     Ms. Snyder has, willfully and unlawfully, gained and exercised unlawful monopoly power in the relevant market alleged herein.

89.     There is no appropriate, pro-competitive, or legitimate business justification for the actions and conduct that have facilitated Ms. Snyder's anticompetitive conduct.

90.     Competition, actual and potential, has been, and will continue to be, unreasonably restrained as a result of Ms. Snyder's unlawful conduct.  Both AMT and Dr. Moore, and patients and consumers have been injured by Ms. Snyder's conduct.

91.     As a direct and proximate result of Ms. Snyder's continuing violation of Section 2 of the Sherman Act, AMT and Dr. Moore have suffered, and continue to suffer, injury and damages in an amount to be proven at trial.

WHEREFORE, Plaintiffs Associates in Medical Toxicology, P.C., and Dr. Philip W. Moore respectfully request judgment in their favor and against Defendant Emogene Renea Snyder.

## Count V
### Unlawful Attempted Monopolization in Violation of Pennsylvania Common Law
Associates in Medical Toxicology and Philip W. Moore v. Emogene Renea Snyder

92.     The foregoing allegations are incorporated by reference.

93.     Ms. Snyder unlawfully attempted to monopolize the relevant market of the sale of CBD products by contacting AMT's CBD representatives and notifying them that she does not permit them to sell their products to AMT.

94.     Ms. Snyder's conduct had and continues to have an anticompetitive purpose and effect on competition, was not offset by any pro-competitive benefits, and was not the least restrictive means of achieving any pro-competitive benefits.

23

95.     Ms. Snyder has, willfully and unlawfully, gained and exercised unlawful monopoly power in the relevant market alleged herein.

96.     There is no appropriate, pro-competitive, or legitimate business justification for the actions and conduct that have facilitated Ms. Snyder's anticompetitive conduct.

97.     Competition, actual and potential, has been, and will continue to be, unreasonably restrained as a result of Mr. Snyder's unlawful conduct.  Both AMT and Dr. Moore, and patients and consumers have been injured by Ms. Snyder's conduct.

98.     As a direct and proximate result of Ms. Snyder's continuing violation of Section 2 of the Sherman Act, AMT and Dr. have suffered, and continue to suffer, injury and damages in an amount to be proven at trial.

WHEREFORE, Plaintiffs Associates in Medical Toxicology, P.C., and Dr. Philip W. Moore respectfully request judgment in their favor and against Defendant Emogene Renea Snyder.

## Count VI
## Breach of Employment Contract

Associates in Medical Toxicology and Philip W. Moore v. Emogene Renea Snyder

99.     The foregoing allegations are incorporated by reference.

100.    On December 10, 2016, Ms. Snyder entered into an employment agreement with AMT effective January 7, 2017, to serve as AMT's Clinical Supervisor.

101.    Ms. Snyder remained employed with AMT until AMT terminated her employment for cause on May 3, 2019.

102.    AMT paid Ms. Snyder's salary in accordance with the compensation plan as outlined in the employment agreement until her termination.

103.    Ms. Snyder breached her employment agreement when she grossly mismanaged AMT's business operations as stated in paragraph 47 above, and misappropriated and disclosed confidential company information, including protected patient health care information.

104.    Due to Ms. Snyder's mismanagement and intentional wrongdoing, AMT and Dr. Moore suffered harm to their reputation, as well as regarding their existing and prospective contractual relations with their patients, and business partners.

WHEREFORE, Plaintiffs Associates in Medical Toxicology, P.C., and Dr. Philip W. Moore respectfully request judgment in their favor and against Defendant Emogene Renea Snyder.

## Count VII
### Identity Theft
Philip W. Moore v. Emogene Renea Snyder

105.    The foregoing allegations are incorporated by reference.

106.    Ms. Snyder misrepresented herself to Dr. Moore's vendors and business partners in order to ruin Dr. Moore's professional reputation and business relationships.

107.    Ms. Snyder used Dr. Moore's personal information to gain access to confidential proprietary information, disable AMT and Dr. Moore's access to their own services, and interfere with Dr. Moore's existing and prospective business relationships.

108.    Ms. Snyder used Dr. Moore's personal information in such a manner, even after AMT and Migliore separated and Ms. Snyder's employment with AMT was terminated.

109.    As a proximate result of Ms. Snyder's identity theft, Dr. Moore has suffered harm regarding both his professional reputation and his existing and prospective contractual relations with his patients and business partners.

WHEREFORE, Plaintiff Dr. Philip W. Moore respectfully request judgment in his favor and against Defendant Emogene Renea Snyder.

### Count VIII
### Defamation

Philip W. Moore v. Emogene Renea Snyder

110.    The foregoing allegations are incorporated by reference.

111.    Ms. Snyder intentionally made false statements of fact about Dr. Moore knowing that the false or incorrect statements would cause damage to Dr. Moore's reputation.

112.    Ms. Snyder published those false statements about Dr. Moore to family members, patients, colleagues, employees of AMT, employers of Dr. Moore and others by directly communicating said defamatory statements to them or posting them on social media.

113.    Ms. Snyder acted maliciously, willfully, intentionally, wantonly, and with actual malice to defame Dr. Moore, entitling Dr. Moore to an award of both compensatory and punitive damages.

114.    Dr. Moore has sustained injury to his reputation and ability to conduct business as a result of Ms. Snyder's actions.

WHEREFORE, Plaintiff Dr. Philip W. Moore respectfully requests judgment in his favor and against Defendant Emogene Renea Snyder, as well as an award of punitive damages.

### Count IX
### Trade Slander and Libel

Associates in Medical Toxicology, P.C., and Philip W. Moore v. Emogene Renea Snyder

115.    The foregoing allegations are incorporated by reference.

116.    Ms. Snyder has made disparaging, false, misleading, and incorrect statements of fact and opinion regarding the nature, characteristics and qualities of AMT and Dr. Moore's services, ability to conduct their business, financial stability, and business reputation to recipients

26

who understood that the statements were applicable to AMT and Dr. Moore and further understood the disparaging nature of the statements.

117.    Ms. Snyder's disparaging, false, misleading, and incorrect statements of fact and opinion regarding the nature, characteristics and qualities of AMT and Dr. Moore's services, ability to conduct their business, financial stability, and business reputation were made systematically and continuously, resulting in harm to AMT and Dr. Moore, including harm to their reputation and ability to conduct business.

118.    Ms. Snyder's statements have actually deceived, or had a tendency to deceive a substantial portion of her intended audience.

119.    Ms. Snyder's statements are material in that they are highly likely to influence the prospective decisions of AMT and Dr. Moore's patients and business partners.

120.    As a result of Ms. Snyder's disparaging, false, and incorrect statements, AMT and Dr. Moore have suffered and continue to suffer direct pecuniary loss.

121.    At all times relevant, Ms. Snyder made the disparaging, false, and incorrect statements concerning AMT and Dr. Moore knowing the falsity and incorrectness of the statements or acting in reckless disregard of the truth, falsity, correctness or incorrectness of the statements.

WHEREFORE, Plaintiffs Associates in Medical Toxicology, P.C., and Dr. Philip W. Moore respectfully request judgment in their favor and against Defendant Emogene Renea Snyder.

## Count X
### Conversion
Associates in Medical Toxicology, P.C., and Philip W. Moore v. Emogene Renea Snyder, Migliore Treatment Services, LLC

122.    The foregoing allegations are incorporated by reference.

123.   Ms. Snyder unlawfully misappropriated AMT's files and emails, containing confidential company information for the purposes of benefiting Ms. Snyder and Migliore.

124.   AMT's files and emails are AMT's property.

125.   On information and belief, Ms. Snyder took possession of AMT's files and emails without its or Dr. Moore's consent with the intent to further develop Ms. Snyder and Migliore's interests.

126.   Ms. Snyder also withheld or removed personal property owned by AMT and/or Dr. Moore and did so without license or privilege.

127.   Ms. Snyder failed to return the personal property belonging to AMT and/or Dr.Moore, despite repeated requests for the return of the personal property.

128.   Ms. Snyder unlawfully exercised control over AMT and/or Dr. Moore's property, and unlawfully retained control over the personal property and used it for the benefit of herself and Defendant Migliore.

129.   Ms. Snyder's unlawful conduct was intentional, malicious, willful, and in disregard of AMT and Dr. Moore's rights in their personal property and other confidential information.

130.   As a direct and proximate cause of Ms. Snyder's unlawful conduct with respect to the conversion of AMT and Dr. Moore's property and other confidential information, AMT and Dr. Moore suffered immediate and irreparable harm.

WHEREFORE, Plaintiffs Associates in Medical Toxicology, P.C., and Dr. Philip W. Moore respectfully request judgment in their favor and against Defendant Emogene Renea Snyder and Migliore Treatment Services, LLC.

**Jury Trial Demand**

Plaintiffs Associates in Medical Toxicology, P.C., and Dr. Philip W. Moore demand a

trial by jury as to all claims and all issues so triable.

Dated:  October 7, 2019                    Respectfully submitted,


*/s/Dennis E. Boyle*
Dennis E. Boyle (PA 49618)
Blerina Jasari (*pro hac vice* forthcoming)
Whiteford, Taylor & Preston L.L.P.
1800 M Street, N.W., Suite 450N
Washington, DC 20036
Telephone: (202) 659-6808
Email: dboyle@wtplaw.com
bjasari@wtplaw.com

*/s/Kathleen Misturak-Gingrich*
Kathleen Misturak-Gingrich (PA 41682)
Law Offices of Peter J. Russo, P.C.
245 Grandview Avenue, Suite 102
Camp Hill, PA  17011
Telephone: (717) 591-1755
Email: kgingrich@pjrlaw.com

*Counsel for Plaintiff*

## VERIFICATION

I PHILIP W. MOORE declare under penalty of perjury that the foregoing is true and correct.

Executed on _____10/03/2019_____