## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ASSOCIATES IN MEDICAL TOXICOLOGY, P.C., and PHILIP W. MOORE, | : : : : | Civil No. 1:19-CV-01753 |
| Plaintiffs, | : : | |
| v. | : : | |
| EMOGENE RENEA SNYDER, and MIGLIORE TREATMENT SERVICES, LLC, | : : : | |
| Defendants. | : : : | Judge Jennifer P. Wilson |

## <u>MEMORANDUM</u>

Before the court is a partial motion for summary judgment filed by

Defendants, Emogene Renea Snyder ("Snyder") and Migliore Treatment Services,

LLC ("Migliore").  (Doc. 180.)  For the reasons that follow, the court will grant in

part and deny in part the motion.

### FACTUAL AND PROCEDURAL BACKGROUND[1]

This case has its genesis at the demise of the parties' personal and

professional relationship.  In July 2015, Plaintiff Philip Moore ("Moore") founded

Associates in Medical Toxicology, P.C. ("AMT"), a medical practice offering

---

[1] In considering Defendants' partial motion for summary judgment, the court relied on the uncontested facts, or where the facts were disputed, viewed the facts and deduced all reasonable inferences therefrom in the light most favorable to the nonmoving party in accordance with the relevant standard for deciding a motion for summary judgment.  *See Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 362 (3d Cir. 2008).

toxicology services.[2]  (Doc. 196-19, p. 19.)[3]  In 2016, Snyder founded Migliore, a facility providing counseling services for individuals struggling with addiction. (Doc. 196-8, pp. 6–7.)  Snyder founded Migliore with her ex-husband, Corey Lingenfelter, who served as Migliore's Chief Financial Officer while Snyder managed the practice.  (*Id.* at 10–11.)  Lingenfelter continued to assist Snyder with Migliore until they decided to get a divorce, and entered into a martial separation agreement in November 2016.  (*Id.* at 12.)

At some point in the Summer of 2016, Snyder began searching for a medical director that would allow Migliore to serve a broader population, which could include Medicaid patients.[4]  (*Id.* at 14.)  Snyder met Moore at a Migliore open house, and began discussing whether he would be interested in the medical director position for Migliore.  (*Id.* at 13–14.)  By August 2016, Moore agreed to accept the position and was hired to work at Migliore.  (*Id.* at 14.)  After Moore assumed the role of Migliore's medical director, and Lingenfelter left Migliore, Snyder

---

[2] Despite AMT's name, Moore did not possess board certification in toxicology, and no employees at AMT were board certified in toxicology.  (Doc. 196-19, p. 19.)

[3] For ease of reference, the court utilizes the page numbers from the CM/ECF header.

[4] Snyder testified that absent a medical director, Migliore was unable to serve Medicaid patients because Medicaid requires a medical director to sign off on treatment plans.  (Doc. 196-8, p. 14.)

purported to convey a majority ownership interest in Migliore to Moore in January 2017.[5]  (Doc. 181-3, pp. 19–20; Doc. 181-16.)

Around the same time, Snyder and Moore decided to merge Migliore and AMT since their practices catered to a similar population.  As part of the "merger," AMT and Migliore shared a phone account, office space in a rented building, payroll platforms, computers, staff, and electronic storage for patient records. (Doc. 196-6, p. 2; Doc. 196-8, p. 34; Doc. 196-11, pp. 7, 22.)  In addition, Moore hired Snyder to serve as AMT's clinical director in December 2016.[6]  (Doc. 196-8, p. 15; Doc. 196-19, p. 45.)

As these business events were unfolding, Snyder and Moore also began a personal relationship in October 2016.  (Doc. 196-8, p. 22.)  Their relationship

---

[5] The court notes that there are multiple versions of the Operating Agreement which purport to convey varying percentages of interest to Moore.  (See Doc. 196-4 (Agreement dated 8/23/2016 conveying 25% to Moore, 70% to Snyder, and 5% to a vacant CFO position; Agreement dated 8/23/2016 conveying 45% to Moore and 65% to Snyder; Agreement dated 1/18/2017 conveying 51% to Moore and 49% to Snyder; Agreement dated 1/1/2019 conveying 20% to Moore and 80% to Snyder).)  In addition, there are also at least two versions of a Memorandum of Understanding purportedly executed by the parties.  (See Doc. 196-3.)  Which of these agreements, if any, is controlling is the subject of disagreement between the parties.

Moreover, Moore's own understanding regarding his ownership in Migliore appears to be equivocal and internally inconsistent.  (See, e.g., Doc. 181-18, pp. 10–11 (expressing a desire to relinquish ownership in Migliore); Doc. 196-19, pp. 46 (maintaining that he had no ownership interest in Migliore, but signed emails as Migliore's president and CEO), 48 (testifying that he had a partial interest in Migliore), 53 (testifying that he had an ownership interest from August 2017 until April or May 2019).)

[6] As part of this arrangement, Snyder drafted her own employment description to work as AMT's clinical director, although she was hired by Moore and remained his subordinate.  (Doc. 196-19, p. 45; see also Doc. 196-29.)

progressed quickly, and Snyder became pregnant with Moore's child in February 2017, and agreed to reside with Moore in May 2017.  (Doc. 196-8, pp. 22–23.)  However, it appears that Snyder and Moore's relationship deteriorated almost as quickly as it began.  By Spring of 2019, Snyder and Moore made the decision to separate in both their personal and professional lives.  (Doc. 196-8, p. 31; Doc. 196-6, p. 2.)  Within weeks, by April 2019, Moore moved AMT's practice to a new location in Camp Hill, taking with it Migliore's access to phone lines, patient files, and records.  (Doc. 196-11, pp. 17–18; Doc. 181-5, p. 23; Doc. 181-12; Doc. 181-18, p. 14.)

In the aftermath of this separation, it appears that the parties had difficulty communicating with one another to facilitate running their businesses separately. Indeed, on May 3, 2019, Moore fired Snyder from AMT, and in the same month, Moore resigned from Migliore and expressed interest in relinquishing his ownership interest.  (Doc. 181-18, pp. 10–11, 13–15.)  There is evidence that AMT's revenue dipped in 2019 after AMT moved to Camp Hill, although the reason for this is disputed by the parties.  (Doc. 181-3, p. 49; Doc. 181-5, pp. 20, 22; Doc. 181-6, pp. 5–6; Doc. 196-11, p. 8; Doc. 196-15, pp. 13–14, 26.)  There is also evidence that Snyder contacted RingCentral, the parties' phone provider, to switch the phone lines to Migliore's control exclusively; accessed the businesses' shared "EMR" system to get patient contact information for appointments; and

deleted emails and documents from AMT's computers.  (Doc. 181-7, pp. 12–13;
Doc. 196-6, pp. 3–4; Doc. 196-7; Doc. 196-8, p. 34; Doc. 196-11, pp. 19–20.)  To
put it simply, it appears that the parties' separation was acrimonious and mutually
destructive.  (*See, e.g.*, Doc. 181-5, pp. 26–27; Doc. 181-10; Doc. 181-13; Doc.
181-18; Doc. 181-19; Doc. 196-6, pp. 3–4; Doc. 196-7; Doc. 196-9; Doc. 196-15,
p. 38; Doc. 196-19, p. 78; Doc. 196-28; Doc. 196-30; Doc. 196-32; Doc. 196-34;
Doc. 197.)  In August 2019, Snyder decided to close Migliore after accepting a
new position with Capital Blue Cross.  (Doc. 196-8, pp. 31, 40.)  However, it
appears that the rancor between the parties has remained.

On the basis of these events, Plaintiffs filed a complaint on October 7, 2019.
(Doc. 1.)  Defendants responded with an answer, which was later amended to
include counterclaims against Plaintiffs on January 2, 2020.  (Docs. 17, 26.)  On
November 30, 2020, Defendants filed a motion for partial summary judgment,
accompanied by a brief in support.  (Docs. 110, 111.)  On February 1, 2021,
Plaintiffs filed a motion to amend/correct the complaint accompanied by a motion
to stay resolution of the motion for partial summary judgment.  (Docs. 117, 119.)
On April 1, 2021, while these two previously filed motions remained pending,
Defendants filed an emergency motion for contempt against Plaintiffs in which
they requested a hearing on this motion.  (Doc. 146.)  Plaintiffs filed their own
motion for contempt a day later on April 2, 2021.  (Doc. 150.)  Based on the state

of the record, the court denied the motion for partial summary judgment, the

motion to stay, and the motion to amend/correct the complaint with leave to file a

renewed motion for summary judgment.  (Docs. 165, 166.)

On June 30, 2021, the parties filed a stipulation of dismissal of all claims

against Migliore in the complaint with prejudice as well as Counts IV and V of the

complaint against Snyder with prejudice.  (Doc. 179.)  On June 30, 2021, Snyder

filed a renewed motion for partial summary judgment accompanied by a

supporting brief.  (Docs. 180, 181.)  Plaintiffs filed a brief in opposition on July 15,

2021.  (Doc. 196.)  Snyder timely filed a reply brief.  (Doc. 205.)  This motion is

therefore ripe for disposition.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 sets forth the standard and procedures for

resolving a summary judgment motion.  Rule 56(a) provides that "[t]he court shall

grant summary judgment if the movant shows that there is no genuine dispute as to

any material fact and the movant is entitled to summary judgment as a matter of

law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317,

322–323 (1986).  A factual dispute is "material" if it might affect the outcome of

the suit under the applicable substantive law, and is "genuine" only if there is a

sufficient evidentiary basis that would allow a reasonable fact-finder to return a

verdict for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

248 (1986). When evaluating a motion for summary judgment, a court "must view the facts in the light most favorable to the non-moving party" and draw all reasonable inferences in favor of the same. *Hugh v. Butler Cty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005).

The moving party bears the initial burden of demonstrating the absence of a disputed issue of material fact. *See Celotex*, 477 U.S. at 324. "Once the moving party points to evidence demonstrating no issue of material fact exists, the non-moving party has the duty to set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor." *Azur v. Chase Bank, USA, Nat'l Ass'n*, 601 F.3d 212, 216 (3d Cir. 2010). The non-moving party may not simply sit back and rest on the allegations in its complaint; instead, it must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (internal quotations omitted); *see also Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001). Further, the non-moving party cannot rely on "general denials or vague statements." *Shaeffer v. Schamp*, No. 06-1516, 2008 WL 2553474, at *4 (W.D. Pa. June 25, 2008) (quoting *Trap Rock Indus. v. Local 825, Int'l Union of Operating Eng'rs*, 982 F.2d 884, 890 (3d Cir. 1992)). Summary judgment should be granted where a party "fails to make a showing sufficient to establish the

existence of an element essential to that party's case, and on which that party will bear the burden at trial." *Celotex*, 477 U.S. at 322–23. "Such affirmative evidence – regardless of whether it is direct or circumstantial – must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance." *Saldana*, 260 F.3d at 232 (quoting *Williams v. Borough of West Chester*, 891 F.2d 458, 460–61 (3d Cir. 1989)).

## DISCUSSION

In the motion for partial summary judgment, Defendants argue that Plaintiffs have failed to support their claims for violations of the Computer Fraud and Abuse Act ("CFAA") due to their failure to produce an expert and provide evidence of a cognizable loss, and because the complained-of conduct is not covered by the CFAA. (Doc. 181, p. 2.) Defendants also assert that they are entitled to summary judgment on Plaintiffs' claims for tortious interference, breach of fiduciary duty, breach of employment contract, and defamation and trade slander/libel. (*Id.*) Finally, Defendants claim that they are entitled to summary judgment on their counterclaims for breach of contract relating to Moore's alleged obligation to file taxes on behalf of Migliore and their defamation and trade slander/libel claims against Moore.[7]

---

[7] The court notes that in Defendants' motion for partial summary judgment, Defendants purport to move for summary judgment on "Counts I–III and VI–X of Plaintiffs' Complaint, or, in the alternative, for summary judgment as to Count I and dismissal of Plaintiffs' remaining state-law

**A. The Motion for Partial Summary Judgment with Respect to Counts IV and V (Unlawful Attempted Monopolization in Violation of the Sherman Act and Pennsylvania Common Law, Respectively) of the Complaint as well as all Claims Against Migliore will be Denied as Moot.**

The court notes that the parties have stipulated to the dismissal with prejudice of Counts IV and V of the complaint as well as all claims against Migliore.  (Doc. 179.)  As such, the court finds that the motion for partial summary judgment, to the extent maintained with respect to these claims which have already been dismissed, will be denied as moot.

**B. The Motion for Partial Summary Judgment with Respect to Count I of the Complaint (Violations of the Computer Fraud and Abuse Act) will be Granted.**

A civil claim under section 1030(a)(4) of the CFAA has four elements: "(1) defendant has accessed a 'protected computer;' (2) has done so without

---

claims.  Defendants further move for summary judgment on Counts I through VI, VIII, and IX of Defendants' Counterclaims against Plaintiffs."  (Doc. 180, p. 1.)  However, it appears that this is the only place that Defendants seek such broad relief.  Indeed, Counts VIII and IX are absent from Defendants' counterclaims.  Moreover, in the proposed order attached to Defendants' motion, Defendants purport to seek partial summary judgment regarding Counts I–VI, and VIII–X in Plaintiffs' complaint, as well as Counts I, VI, and VII of Defendants' counterclaims.  Specifically, Defendants seek judgment as to their counterclaim in Count I with respect to Moore's failure to file taxes on Migliore's behalf.  In addition, Defendants seek dismissal of all claims against Migliore.  (Doc. 180-1.)  Defendants' brief in support and reply brief are consistent with the proposed order attached to the motion for partial summary judgment.  Therefore, the court does not consider whether summary judgment should be granted as to the following claims, which will remain active in this case regardless of the court's summary judgment ruling: Count VII of the complaint (identity theft against Snyder); Count X of the complaint (conversion against Snyder); and Counts II through V of Defendants' counterclaims (breach of contract against Moore unrelated to the tax filings for Migliore; breach of fiduciary duty against Moore; minority member oppression against Moore; misappropriation of trade secrets against Moore and AMT; and conversion against Moore and AMT).

authorization or by exceeding such authorization as was granted; (3) has done so 'knowingly' and with 'intent to defraud'; and (4) as a result has 'furthered the intended fraud and obtained anything of value.'"  *P.C. Yonkers, Inc. v. Celebrations the Party & Seasonal Superstore, LLC*, 428 F.3d 504, 508 (3d Cir. 2005) (quoting 18 U.S.C. § 1030(a)(4)).  Courts within this circuit have cautioned that:

> The CFAA "remains primarily a criminal statute designed to combat hacking," and, as such, jurisprudential care should be taken not to "contravene Congress's intent by transforming a statute meant to target hackers into a vehicle for imputing liability to [defendants] who access computers or information in bad faith."

*Christian v. Lannett Co.*, No. 16-963, 2018 U.S. Dist. LEXIS 52793, at *16 (E.D. Pa. Mar. 29, 2018) (quoting *QVC, Inc. v. Resultly, LLC*, 159 F. Supp. 3d 576, 590 (E.D. Pa. 1990)).

For purposes of the CFAA, a "protected computer" is one "which is used in or affecting interstate or foreign commerce or communication."  18 U.S.C. § 1030(e)(2).  The parties do not appear to dispute that the computers at issue are "protected computers" for purposes of the CFAA.  While there has been no evidence presented on this point, the court finds that the computers at issue in this case qualify as "protected computers" under the CFAA "because the definition embraces any computing device that may be used in interstate commerce."

*Mifflinburg Tel., Inc. v. Criswell*, 277 F. Supp. 3d 750, 792 (Pa. M.D. 2017)

(citation omitted).

With respect to the second element, whether the individual alleged to have

violated the CFAA had authorization to access the computer, courts have explained

that:

> Both Sections a(5) and "Section 1030(a)(2)(C), [] requires [Defendant] to have accessed [Plaintiff's] computer system 'without authorization.'" *QVC, Inc. v. Resultly, LLC*, 159 F. Supp. 3d 576, 595 (E.D. Pa. 2016). "'Authorization is not defined by the CFAA, and the Third Circuit has not yet addressed the meaning of 'authorization' in the context of the statute." *Id.* "[T]hose who have permission to access a computer for any purpose, such as employees, cannot act "without authorization" unless and until their authorization to access the computer is specifically rescinded or revoked." *Id.* "No language in the CFAA supports [the] argument that authorization to use a computer ceases when an employee resolves to use the computer contrary to the employer's interest." *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1133 (9th Cir. 2009). "[A] person who uses a computer 'without authorization' has no rights, limited or otherwise, to access the computer in question." *Id.* Accordingly, "[w]hile disloyal employee conduct might have a remedy in state law, the reach of the CFAA does not extend to instances where the employee was authorized to access the information he later utilized to the possible detriment of his former employer." *Brett Senior & Assocs., P.C. v. Fitzgerald*, No. 06-1412, 2007 U.S. Dist. LEXIS 50833, at *9–10 (E.D. Pa. July 13, 2007). Chief Judge Christopher C. Conner of this Court has held that "the CFAA prohibits unauthorized *access* to information rather than unauthorized *use* of such information." *Advanced Fluid Sys., Inc. v. Huber*, 28 F. Supp. 3d 306, 329 (M.D. Pa. 2014). Chief Judge Conner further noted that unauthorized access includes an employee continuing to access an employer's computers after leaving employment. *Id.*

*Mifflinburg Tel., Inc.*, 277 F. Supp. 3d at 792–793 (cleaned up). Indeed, "an

employee granted access to a computer in connection with his [or her] employment

is 'authorized' to access that computer under the CFAA regardless of his or her intent or whether internal policies limit the employee's use of the information accessed." *ClinMicro Immunology Ctr., LLC v. PrimeMed, P.C.*, No. 3:11-cv-2213, 2016 U.S. Dist. LEXIS 88774, at *27 (M.D. Pa. July 7, 2016) (collecting cases), report and recommendation adopted by 2016 U.S. Dist. LEXIS 99608 (M.D. Pa. July 29, 2016).

In this case, Snyder served as AMT's clinical director from December 2016 until her employment was terminated on May 3, 2019. It is undisputed that during this time period, Snyder managed the daily operations of AMT. It is also undisputed that AMT and Migliore shared computers, staff, and electronic storage for patient records prior to their separation in Spring 2019. In her role as clinical director of AMT prior to the termination of her employment, it is without question that Snyder was authorized to access AMT's computers; indeed, they were shared between AMT and Migliore. While in hindsight, Plaintiffs may be displeased with Snyder's *use* of the information she accessed during her employment with AMT, her *access* was not unauthorized for purposes of the CFAA and cannot stand as the basis for this claim. *Huber*, 28 F. Supp. 3d at 329 ("the CFAA prohibits unauthorized *access* to information rather than unauthorized *use* of such information"). The court will accordingly grant Defendants' motion for summary judgment on Plaintiffs' CFAA claim to the extent it is based on computer access

by Snyder during her tenure as AMT's clinical director because her access to the AMT computers was authorized during that time.[8]

Plaintiffs' remaining ground for their allegation that Snyder violated the CFAA is that Snyder, "starting on May 5, 2019, . . . who at that time was in possession of at least five AMT computers, accessed these computers and began to erase all data stored on them.  On May 7, 2020, Snyder even contacted an Apple representative to aid her in the 'wiping of these devices.'"  (Doc. 196, p. 14.)[9]  The court finds that it is unclear from the record whether these computers were left behind deliberately as a courtesy from Moore to Snyder for Migliore's use or whether Moore intended to retrieve these computers for AMT's use.  (*See* Doc. 181-8, p. 6 (email dated May 13, 2019 from Plaintiffs' counsel requesting dates and times for Moore to pick up items left behind at Migliore, including, inter alia,

---

[8] The court notes that this ruling includes the allegation that Snyder deleted emails from Heather Barner's email account.  This alleged occurrence took place while Snyder was still employed as AMT's clinical director.  Snyder admitted to deleting these emails, noting that she did so after logging onto the computer with the proper credentials.  Barner testified that she worked for both AMT and Migliore jointly, and that she was supervised by both Snyder and Moore.  (Doc. 196-11, p. 7.)  Thus, at this time, Snyder was authorized to access the computer at issue as AMT's clinical director and Barner's supervisor.

[9] Plaintiffs also allege that "on May 6, 2019, Snyder accessed AMT's RingCentral account without authorization" and changed passwords and other account information, preventing Plaintiffs from accessing their phone lines.  (Doc. 196, p. 15.)  However, there is no factual support for the notion that Plaintiffs' RingCentral account was accessed via a computer—a foundational requirement for a claim to be brought under the CFAA.  To the contrary, there is evidence that RingCentral was Plaintiffs' phone service provider and that Snyder called and/or sent a letter to RingCentral to change the account access and credentials.  Absent any connection to the computers at issue in this claim, the court finds that any claims relating to Plaintiffs' RingCentral account cannot be brought under the CFAA and will accordingly be dismissed.

computers); *but see* Doc. 181-18, p. 3 (letter from Plaintiffs' counsel dated May 3, 2019 noting that Moore "graciously left 2 MAC Mini computers (in addition to 3 Dell computers, owned by Migliore) . . . for the convenience of, and use by, Migliore.").)  Indeed, Moore explicitly designated at least one of these computers for Snyder's use.  (Doc. 181-18, pp. 13–14 ("While your laptop is the property of AMT, I am willing to allow you to keep it, subject to the following conditions[,]" including deleting "any and all AMT and/or AMT related records, documentation and/or information from the laptop[.]").)  Thus, the court finds that there is a dispute of material fact regarding whether Snyder was authorized to access these computers.  On one hand, if Moore left the computers for Migliore's use, it cannot be maintained that Snyder, as the manager of Migliore, was unauthorized to access them, and could thus do with them as she pleased.  Then again, if Moore intended to retrieve the computers for AMT's use, Snyder's access becomes more questionable.

However, even if Snyder's access was unauthorized, the court finds that Plaintiffs have neither alleged, nor produced any record evidence that ties these computers and Snyder's alleged retention and access of them to any alleged loss in this case as required by the fourth element of a CFAA claim.[10]  This element is

---

[10] The court notes that neither party has addressed the third element in a CFAA claim, whether Snyder had the intent to defraud when she accessed AMT's computers.  The court notes its absence from the record, and finds that it would be appropriate to grant the remainder of

satisfied by showing an aggregate loss of $5,000 or more "to 1 or more persons during any 1-year period." 18 U.S.C. §§ 1030(c)(4)(A)(i)(I), (g). The CFAA defines "damage" as "any impairment to the integrity or availability of data, a program, a system, or information." 18 U.S.C. § 1030(e)(8). It defines "loss" as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." *Id.* § 1030(e)(11).

Plaintiffs have not alleged or established that Snyder's "wiping of these devices" disrupted Plaintiffs' access to AMT's computers. Indeed, Plaintiffs' only concretely alleged and supported loss stems from the time and resources spent recovering Barner's emails, which the court has already concluded occurred during a time when Snyder was authorized to access AMT's computers. While alleged, there is no evidence that the "more than $500,000.00" loss in 2019 was attributable

---

Defendants' motion for summary judgment on these grounds. However, out of an abundance of caution, noting Defendants' silence on this point, the court addresses the fourth element of a CFAA claim with respect to Snyder's computer access after her employment with AMT was terminated.

to Snyder's actions vis-à-vis AMT's computers.  Therefore, the court will grant

summary judgment to dismiss Plaintiffs' CFAA claim in its entirety.[11]

**C. The Motion for Partial Summary Judgment with Respect to Count II of the Complaint (Intentional and Tortious Interference with Contract and with Prospective Contractual Relations) will be Granted in Part and Denied in Part.**

Under Pennsylvania law, to set forth a claim for tortious interference with

contractual relations, a plaintiff must allege that the defendant, "without a privilege

to do so, induce[d] or otherwise purposely cause[d] a third person not to (a)

perform a contract with another, or (b) enter into or continue a business relation

with another."  *Thompson Coal Co. v. Pike Coal Co.*, 412 A.2d 466, 470 (Pa.

1979) (quoting Restatement of Torts, § 766 (1939)).  Similarly, to set forth a claim

for tortious interference with prospective contractual relations, a plaintiff must

allege: "(1) a prospective contractual relation; (2) the purpose or intent to harm the

plaintiff by preventing the relation from occurring; (3) the absence of privilege or

justification on the part of the defendant; and (4) the occasioning of actual damage

resulting from the defendant's conduct."  *Id.* at 471 (quoting *Glenn v. Point Park*

*College*, 272 A.2d 895, 898 (Pa. 1971)).

---

[11] In light of the court's conclusion that summary judgment is appropriate on the merits of this claim, the court does not consider Defendants' argument that summary judgment should be granted based on Plaintiffs' failure to elicit expert testimony on this claim.

In this case, Plaintiffs assert that Snyder interfered with their existing relationships with patients and vendors/business partners which resulted in decreased revenue for AMT in 2019. (Doc. 196, pp. 21–23.) In addition, Plaintiffs claim that Snyder interfered with their account at RingCentral which resulted in their phone systems being disrupted for a few days. (*Id.*)

With respect to Plaintiffs' existing relationships with patients, the court finds that there is evidence that Snyder contacted certain patients to inform them of the following:

> We are so sorry to notify you that Dr. Moore, Associates in Medical Toxicology, will not be affiliated with Migliore Treatment Services. As many of you know our patients and staff are like family to us, and we do not want this to impede you in your recovery so we have worked very closely with a wonderful practice Pinnacle Health Center for Addiction Recovery, Greg Swartzentruber, MD and Teresa. They are easily located on 2501 North 3rd Street Harrisburg, Pa and their phone number is 717-782-4781. Please let them know you are a Migliore patient, they have assured us they will get you into treatment within 48 hours, they will continue/maintain pharmacotherapy (MAT) services, physician will always be present to patients, they have a high level of patient care and they do not have long waiting room times. We are very pleased to be working with this practice and to be able to continue quality treatment services for your needs. Please let us know if you have any questions.

(Doc. 197, p. 3 (errors in original).) In response to Snyder's email, some patients stated that they felt like they were being told that they "lost their doctor" (referring to Dr. Moore). (*Id.* at 4, 7–8.) However, other patients responded to Snyder's email to complain about AMT's care after AMT left Migliore, to which Snyder

sent reply emails indicating that these patients could file malpractice suits or a report with the Pennsylvania Department of State regarding their complaints about AMT.  (*Id.* at 10–11.)

The court finds that these emails are equivocal regarding their target audience.  Specifically, there is no evidence that the patients who received Snyder's email were exclusively patients of AMT.  To the contrary, it appears that the patients who received Snyder's initial email were individuals who enjoyed a prior contractual relationship with Migliore.  (*Id.* at 3 ("Please let them know you are a Migliore patient").)  While these patients could have received care from both AMT and Migliore, it does not appear that Snyder was without privilege to send the email given her role with Migliore.

Regardless of which entity provided these patients' care, the court finds that the emails sent by Snyder do not constitute inducement to enter a business relationship with another.  To the contrary, Snyder merely indicates that Migliore has partnered with another treatment facility which is available to accept these patients in light of AMT's departure.  The email does not state that AMT and Moore are no longer available to see patients, although at least some patients expressed confusion on this point; instead, the email states that AMT "will not be affiliated with Migliore Treatment Services."

Likewise, Snyder's responsive emails to patients who had complained about AMT's services did not induce these patients to seek care from a provider other than AMT.  Instead, Snyder recognizes these patients' frustration and offers that they may pursue legal action against AMT to validate their concerns.  The notion that these patients would continue their treatment with AMT in light of the concerns expressed in their emails is dubious.

In sum, patients in receipt of Snyder's emails were free to continue their treatment with AMT or with Pinnacle Health.  Indeed, some patients followed AMT to its new location.  However, there is no evidence that Snyder induced patients to cease treatment services with AMT.  Therefore, the court finds that to the extent that Plaintiffs seek to support their claim for interference with existing contracts with patients, the court will grant Defendants' motion for summary judgment to foreclose this basis for the claim.[12]

With respect to Snyder's alleged interference with ongoing business relationships, the court finds that there is no evidence to support this claim.  While there is evidence that Snyder contacted certain vendors, business partners, and other professional organizations with which AMT and Moore had ongoing

---

[12] The court notes that there is testimony from Natasha Lugaro, Snyder's executive assistant, that she observed Snyder send messages to AMT patients via text, email, or social media platforms urging them not to see Moore for treatment.  (Doc. 196-6, p. 3.)  However, there is no record evidence to shed light on the substance of these communications even assuming they occurred, and there is no evidence that the patients who were contacted in this manner accepted Snyder's advice to discontinue their treatment relationship with Plaintiffs.

relationships, there is no evidence that Snyder induced or otherwise caused these entities to cease performance on their contracts with Plaintiffs or otherwise enter into a business relationship with an entity other than Plaintiffs. Indeed, Snyder may have intended to induce these entities to cease interacting with Plaintiffs, but there is no evidence that her intentions were realized. To the contrary, there is evidence that these relationships continued with Plaintiffs. (*See, e.g.*, Doc. 197, pp. 22–26, 34–36; Doc. 196-9.)

The court notes an exception for Plaintiffs' business relationship with RingCentral. The evidence presented could support the conclusion that Snyder, without license,[13] induced RingCentral to continue its business relationship with Snyder, instead of Plaintiffs. Indeed, in a letter dated June 5, 2019, well after Snyder's employment had been terminated with AMT, Snyder indicated that certain phone numbers previously utilized by Plaintiffs should be transferred to Defendants because "Mr. Moore is no longer utilizing these phone lines." (*See*

---

[13] The court notes that in a letter sent by Plaintiffs' counsel to Snyder dated May 3, 2019, Plaintiffs' counsel states that:

> While AMT was previously willing to allow Migliore to port six of the Migliore telephone numbers from RingCentral, Ms. Snyder's recent actions have caused Dr. Moore to rethink that generosity. Therefore, Ms. Snyder and Migliore have until the close of business on May 8, 2019 to arrange new phone and fax numbers for Migliore. Thereafter, the existing Migliore phone and fax numbers will no longer be available to Migliore as the RingCentral contract is with AMT.

(Doc. 181-18, p. 6.) Therefore, it appears that after May 8, 2019, Snyder was without license to induce RingCentral to continue a business relationship with herself and Migliore, rather than Plaintiffs.

Doc. 196-13, p. 4.)  It appears that there was interruption to Plaintiffs' phones as a result of Snyder's conduct, and a reasonable jury could connect these events. (Doc. 196-5, p. 4.)  Therefore, on these narrow grounds, the court finds that summary judgment is inappropriate and will deny the motion.

Finally, there is no evidence in the record that Snyder interfered with prospective contractual relations.  Indeed, there has been no evidence or argument presented regarding what relationships Plaintiffs sought to pursue or with whom. In light of this absence, the court will grant the motion for summary judgment to preclude Plaintiffs from maintaining a claim for alleged interference with prospective contractual relations.  The motion for summary judgment will accordingly be granted in part and denied in part.

### D. The Motion for Partial Summary Judgment with Respect to Count III of the Complaint (Breach of Fiduciary Duty) will be Granted.

Plaintiffs claim that Snyder breached her fiduciary duties owed to AMT and Moore in the following ways: by allegedly destroying important AMT files and later making false reports to administrative agencies that AMT failed to maintain these records in the ordinary course; by accessing confidential patient information and referring patients to other providers; and making other false reports to administrative agencies regarding Plaintiffs' practice.  (Doc. 196, pp. 23–25.)  The court observes that because the parties are so mired in their personal disagreements

with each other, they have failed to recognize the absence of a fiduciary relationship between Snyder and Plaintiffs.

Foundational to establishing a claim for breach of fiduciary duty under Pennsylvania law is the existence of an agency relationship between the parties. *Kearney v. JPC Equestrian, Inc.*, No. 3:11-cv-1419, 2012 U.S. Dist. LEXIS 123498, at *20 (M.D. Pa. June 7, 2012) (citing *eToll, Inc. v. Elias/Savion Advertising, Inc.*, 811 A.2d 10, 21 (Pa. Super. Ct. 2002)), report and recommendation adopted at 2012 U.S. Dist. LEXIS 40662 (M.D. Pa. Aug. 30, 2012). The Pennsylvania Supreme Court has described the principal-agent relationship as follows:

> The law is clear in Pennsylvania that the three basic elements of agency are: "'the manifestation by the principal that the agent shall act for him, the agent's acceptance of the undertaking and the understanding of the parties that the principal is to be in control of the undertaking.'" *Scott v. Purcell*, 415 A.2d 56, 60 (1980), quoting Restatement (Second) of Agency § 1, Comment b (1958); *see also Reid v. Ruffin*, 469 A.2d 1030, 1033 (1983). "Agency results only if there is an agreement for the creation of a fiduciary relationship with control by the beneficiary." *Smalich v. Westfall*, 269 A.2d 476, 480 (1971). The burden of establishing an agency relationship rests with the party asserting the relationship. *Scott*, 415 A.2d at 61 n.8. "An agency relationship is a fiduciary one, and the agent is subject to a duty of loyalty to act only for the principal's benefit." *Sutliff v. Sutliff*, 528 A.2d 1318, 1323 (1987), citing Restatement (Second) of Agency § 387 (1958). Thus, in all matters affecting the subject of the agency, the agent must act with the utmost good faith in furthering and advancing the principal's interests, including a duty to disclose to the principal all relevant information. *See Sylvester v. Beck*, 178 A.2d 755, 757 (1962).

*Basile v. H & R Block*, 761 A2d 1115, 1120 (Pa. 2000). The Pennsylvania Supreme Court has emphasized that not all actions taken on another's behalf will form an agency relationship. *Id.* at 1121 ("[T]he action must be a matter of consequence or trust, such as the ability to actually bind the principal or alter the principal's legal relations. Indeed, implicit in the long-standing Pennsylvania requirement that the principal manifest an intention that the agent act on the principal's behalf is the notion that the agent has authority to alter the principal's relationships with third parties, such as binding the principal to a contract.").

In this case, Plaintiffs have set forth no evidence which would establish an agency relationship between Snyder and Plaintiffs. To the contrary, in the pleadings before the court, Plaintiffs have alleged that Snyder breached her employment contract with Plaintiffs by "grant[ing] access to AMT's locked medication storage room to all employees without Dr. Moore's knowledge or authorization," "frequently draft[ing] and sign[ing] AMT contracts for Dr. Moore without Dr. Moore's knowledge or authorization," and "purchas[ing] costly marketing materials without Dr. Moore's knowledge or authorization." (Doc. 196, pp. 26–27.) It is therefore apparent to the court that no agency relationship was contemplated when Snyder agreed to serve as AMT's clinical director. Indeed, Plaintiffs' apparent distress that Snyder signed contracts on their behalf without Moore's knowledge is sufficient to state that "[t]here is nothing to suggest that this

business relationship was something other than that of a company and [its employee]." *Kearney*, 2012 U.S. Dist. LEXIS 123498, at *24.  Based on the absence of proof establishing a fiduciary relationship, the court will grant the motion for summary judgment to dismiss this claim.

### E. The Motion for Partial Summary Judgment with Respect to Count VI of the Complaint (Breach of Employment Contract) will be Granted.

To maintain a breach of contract claim under Pennsylvania law, a plaintiff must prove "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages." *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225 (3d Cir. 2003) (citing *CoreStates Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999)).

With respect to Plaintiffs' claim for breach of contract, the parties' arguments are more concerned with making mutual ad hominem attacks than the application of the legal standard to the facts produced in discovery.  Here, Plaintiffs' claim for breach of employment contract fails on the first element.  The alleged employment contract at issue is conspicuously absent from the record, let alone the essential terms that Plaintiffs alleged were breached.  The only document that could be construed as establishing any obligations relating to Snyder's employment with AMT is her job description, a document drafted by Snyder, but unsigned by the parties.  (Doc. 196-29.)  The court does not perceive this document to be a contract, although Plaintiffs appear to view it this way.

Even assuming Snyder's self-composed job description formed an employment contract, despite highlighting certain responsibilities as forming the basis for Snyder's alleged breach, Plaintiffs fail to produce any evidence in support of their assertion that Snyder breached her self-described job responsibilities. Plaintiffs claim that Snyder failed to meet her employment obligations by failing to supervise and train staff and by failing to maintain the confidentiality of AMT clients as the source of her breach.  (Doc. 196, p. 25.)  However, the assertion that Snyder failed to supervise or train employees is belied by the testimony of AMT's staff, who uniformly stated either that they did not recall Snyder failing to train or supervise them or that Snyder was an adequate supervisor who was able to provide training and supervision when asked.  There has been <u>no</u> evidence produced that Snyder breached AMT patients' confidentiality.

The remaining assertions of breach argued in Plaintiffs' brief are not connected in any way to any obligations listed in Snyder's job description.  In other words, the court has no document before it to verify whether Snyder's falsification of AMT bills, grant of access to AMT's medication storage room, or any other allegation set forth by Plaintiffs constituted a breach of a specific provision of Snyder's employment contract (which either does not exist or has not been included in the record).  For all of these reasons, the court will grant the motion for summary judgment with respect to this claim.

**F. The Motion for Partial Summary Judgment with Respect to Counts VIII and IX of the Complaint (Defamation and Trade Slander and Libel, Respectively) will be Denied.**

A claim for defamation under Pennsylvania law includes the following elements: "(1) The defamatory character of the communication; (2) Its publication by the defendant; (3) Its application to the plaintiff; (4) The understanding by the recipient of its defamatory meaning; and (5) The understanding by the recipient of it as intended to be applied to the plaintiff." *Graboff v. Colleran Firm*, 744 F.3d 128, 135 (2014) (quoting 42 PA. CONST. STAT. § 8343(a) (West 1998)).  A statement is defamatory if "it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Tucker v. Fischbein*, 237 F.3d 275, 282 (3d Cir. 2001) (quoting *Birl v. Phila. Elec. Co.*, 167 A.2d 472, 476 (Pa. 1960) (internal quotation marks omitted)).  "[T]he statement must do more than merely embarrass or annoy the plaintiff; it must provoke the kind of harm which has grievously fractured [one's] standing in the community of respectable society." *Graboff*, 744 F.3d at 136 (quoting *Tucker*, 848 A.2d at 124) (quotation marks omitted).

Claims for trade slander or libel are analyzed under a similar standard to claims for defamation. *Matthews Int'l, Corp. v. Biosafe Eng'g, LLC*, No. 11-269, 2011 U.S. Dist. LEXIS 110010, at *33 n.8 (W.D. Pa. Sept. 27, 2011) ("In Pennsylvania, trade libel and defamation are often treated under the same

standard.")  A claim for trade libel is actionable where: "(1) the statement is false; (2) the publisher either intends the publication to cause pecuniary loss or reasonably should recognize that publication will result in pecuniary loss; (3) pecuniary loss does in fact result; and (4) the publisher either knows that the publication is false or acts in reckless disregard of its truth or falsity." *Pro Golf Mfg., Inc. v. Tribune Review Newspaper Co.*, 809 A.2d 243, 246 (Pa. 2002) (citing Restatement (Second) of Torts § 623(a)).

As a defense to either a claim for defamation or trade libel, a defendant may show that his or her statements were "substantially true."  *See* 42 PA. CONST. STAT. § 8343(b)(1) (West 2013); *see also Dunlap v. Phila. Newspapers, Inc.*, 448 A.2d 6, 15 (Pa. Super. Ct. 1982) ("The proof of truth must go to the gist or sting of the defamation.").  Despite the availability of the defense, courts have cautioned that "a defamatory statement must be viewed in context," *Baker v. Lafayette Coll.*, 532 A.2d 399, 402 (Pa. 1987), and truth is unavailable as a defense where "the implication of the communication as a whole was false," even if the statement is "literally accura[te]." *Dunlap*, 448 A.2d at 15.

The record in this case is replete with evidence of potentially defamatory statements made by Snyder about Moore and vice versa.  Indeed, it is clear that the parties' have engaged in a course of conduct intended to personally and

professionally harm the other.  In support of Plaintiffs' defamation claim, Plaintiffs

point to the following statements allegedly made by Snyder:

Dr. Moore is a narcissist, sociopath, and psychopath.

Dr. Moore suffers from a "narcissism personality disorder" and "alcohol abuse" which caused him to "harm [Snyder] and [her] family."

Dr. Moore is emotionally and physically abusive towards Snyder and his daughter.

Dr. Moore suffers from an alcohol and drug addiction.

Dr. Moore violated a court order in order to "withhold a child from [her] mother."

Dr. Moore "treated his mother like trash and was physically violent with her several times."

Snyder sent text messages to AMT employees and patients that Dr. Moore has a sexually transmitted disease which he "keeps passing around."

Dr. Moore had "inappropriate physical contact with his daughter."

Snyder sent text messages to a patient that her attorney is "working on serving [Dr. Moore] bankruptcy forms" and that Dr. Moore is going to be incarcerated.

Snyder sent text messages to a patient stating that the "[j]udge blew [Dr. Moore] up in court for his drug use and alcoholism."

Snyder sent text messages to a former AMT employee stating that Dr. Moore will "no longer [be] a physician owe[] a ton of money to [the] government and will spend nice time in prison for both federal and state crimes."

Dr. Moore "ripped [Snyder] off the bed with the mattress" if she "f[e]ll asleep without telling him", had "drunk rages and black outs", and

"wre[cked] the car twice [because] of being drunk", amongst other things.

Dr. Moore "lie[d] to the state and feds" and is "willing to lie under oath."

Dr. Moore is "falsely advertising [his] services."

Dr. Moore has no board certifications.

Dr. Moore committed "computer crimes."

Dr. Moore and AMT engaged in "fraudulent activity."

Snyder sent an e-mail to the Cumberland County Commissioner stating that they "should probably [sic] check with department of state regarding [Dr. Moore's] professional licensure and current pending investigations for drug/alcohol use.

Dr. Moore is "a crazy ex narc" who "should be incarcerated."

There are "multiple levels of criminal and civil cases currently pending against Dr. Moore as well as investigation into his current license and practices."

Snyder sent an e-mail to Plaintiffs' medical billing company, Velocity Medical Billing, stating that Dr. Moore is "flagged across the state and can[not] even bill for his new location because of the fraud investigation with CMS."

AMT "abandoned patient care."

AMT is "a non-licensed drug and alcohol treatment provider."

AMT is "not enrolled in Medicaid/Medicare services."

(Doc. 196, pp. 28–30 (cleaned up).)

Viewing the facts in the light most favorable to Plaintiffs, a reasonable jury could find that these statements were so harmful to Plaintiffs' reputation "as to lower [them] in the estimation of the community or to deter third persons from associating or dealing with [them]" personally and professionally. *Tucker*, 237 F.3d at 282 (quoting *Birl*, 167 A.2d at 476 (internal quotation marks omitted)). The question of whether the statements are defamatory is context-specific, and a reasonable jury could also find that the frequency, location, and/or tenor of Snyder's statements against Plaintiffs were defamatory. Moreover, a reasonable jury could conclude that the loss to Plaintiffs' business in 2019 was, at least partly, attributable to Snyder's statements.

Defendants allege that the statements above are true, and that Snyder was therefore privileged to make them. Initially, and by way of example only, the court notes that it is not appropriate for the court to weigh the evidence in resolving a summary judgment motion to determine whether it is in fact true that Moore is "a narcissist, sociopath, and psychopath." Rather, the truth of this statement, and the other assertions listed above is a fact-intensive inquiry appropriate for jury resolution. The court will therefore deny the motion for summary judgment with respect to these claims.

**G. The Motion for Partial Summary Judgment with Respect to Count I of Defendants' Counterclaims (Breach of Contract Regarding Moore's Alleged Tax Obligations vis-à-vis Migliore) will be Denied.**

As explained above, to maintain a breach of contract claim under Pennsylvania law, a plaintiff must prove "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages." *Ware*, 322 F.3d at 225 (citing *CoreStates Bank, N.A.*, 723 A.2d at 1058).

Snyder claims that Moore was Migliore's "tax matters partner" under Migliore's Operating Agreement. (Doc. 181, p. 35.) As such, Moore was allegedly responsible for filing the state and federal income tax returns for the business as well as providing a Form K-1 to Snyder that would enable her to file her personal state and federal tax returns. (*Id.*) Snyder asserts that Moore failed to file these returns or provide Snyder with K-1 forms for 2018 and 2019, and that Snyder has therefore suffered harm based on "exposure to interest and penalties" for her personal taxes. (*Id.*) Moore counters that he did not validly receive an interest in Migliore, and therefore had no obligation to file taxes for the business. (Doc. 196, pp. 33–37.)

All Operating Agreements of record contain the same provisions regarding tax matters:

> The Managers shall designate a Member serving as a Manager, or if there is none, or if none are eligible or able to act, any Member, as the

tax matters partner for federal income tax purposes.  The tax matters partner is authorized and required to represent the Company in connection with all examinations of the Company's affairs by tax authorities, including resulting administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith.  The tax matters partner shall have the final decision making authority with respect to all Federal income tax matters involving the Company.  The Members agree to cooperate with the tax matters partner and to do or refrain from doing any or all things reasonably required by the tax matters partner to conduct such proceeding.  Any direct out-of-pocket expense incurred by the tax matters partner in carrying out his/her or their obligations hereunder shall be allocated to and charged to the Company as an expense of the Company for which the tax matters partner shall be reimbursed.

. . . .

The Managers shall cause the Company to file a Federal income tax return and all other tax returns required to be filed by the Company for each Fiscal Year or part thereof, and shall provide to each person who at any time during the Fiscal Year was a Member with an annual statement (including a copy of Schedule K-1 to Internal Revenue Service Form 1065) indicating such Member's share of the Company's income, loss, gain, expense and other items relevant for Federal income tax purposes.  Such annual statement may be audited or unaudited as required by the Managers.

(Doc. 196-4, pp. 14–15, 42–43, 70–71, 96 (cleaned up).)  In each Operating

Agreement, the Managers and Members are listed as Snyder and Moore.  (*Id.* at

28–29, 56–57, 84–85, 107–08.)

Under the plain language of the Operating Agreements, the court finds that

Snyder and Moore were jointly responsible for filing Migliore's state and federal

tax returns since the Agreements state that "[t]he *Managers* shall cause the

Company to file a Federal income tax return and all other tax returns required to be filed by the Company for each Fiscal Year or part thereof," as well as providing each Member with a copy of Schedule K-1 to Internal Revenue Service Form 1065. (Doc. 196-4, pp. 15, 43, 71, 96 (emphasis added).) Thus, while the tax matters partner position serves as the representative of Migliore "in connection with all examinations of the Company's affairs by tax authorities, including resulting administrative and judicial proceedings," is licensed to spend Migliore's funds for tax preparation services, and has the "final decision making authority with respect to all Federal income tax matters involving the Company[,]" there is nothing indicating that the tax matters partner is *solely* responsible for filing Migliore's taxes. This is the case regardless of which Operating Agreement is operative between the parties.

However, there is a dispute of material fact regarding Moore's status vis-à-vis Migliore. While Snyder asserts that she transferred ownership of Migliore to Moore, that he was designated as Migliore's tax matters partner, and that he was solely responsible for filing Migliore's taxes and providing her with a K-1 form, there is record evidence of at least four Operating Agreements, all of which purport to convey different percentages of interest in Migliore to Moore. Moore also disputes that these Operating Agreements served as valid conveyances since there is nothing of record indicating that Snyder complied with the Operating Agreement

when her ex-husband left Migliore's Member/Manager ranks and Moore

purportedly joined.  Indeed, Moore asserts that Snyder's separation agreement with

her ex-husband, upon which Snyder bases her authority to transfer ownership in

Migliore, is equivocal regarding the precise time that Snyder became the sole

owner with authority to transfer an interest to Moore.  For Moore's part, while he

steadfastly asserts that he did not own any part of Migliore, there is evidence that

he filed Migliore's tax return in 2017 and has otherwise held himself out as an

owner of Migliore.

With the facts as presented on the record, the court would be required to

weigh the evidence and make credibility determinations—a process reserved solely

for the jury.  Therefore, the court will deny the motion for summary judgment as to

this claim.

### H. The Motion for Partial Summary Judgment with Respect to Counts VI and VII of Defendants' Counterclaims (Trade Slander/Libel and Defamation, Respectively) will be Denied.

Rather than restate the standards of review with respect to defamation and

trade slander/libel claims, the court incorporates these standards by reference as set

forth above.

Snyder's defamation and trade slander/libel claims are based on Moore's

statements to Capital Blue Cross, Snyder's employer at the time, regarding her

qualifications for the position she held.  Specifically, Moore sent an email on

September 21, 2019 at 1:17 a.m. to Capital Blue Cross, Snyder's employer, titled

"Snyder character, acute and chronic behaviors…" in which he stated the

following:

> I recall Emogene Renea Snyder was the recently hired Division Director of Behavioral Health at Capital Blue Cross?  I received a message from Snyder (refer to IMG_0613-1.jpeg) using an app ordered by the York County Court of Common Pleas).  I fear the message received has already been reviewed by the court (as all messages are), shared and will have consequences for Snyder's personal and professional career.  Normally, communications such as these are ignored but after years tolerating unnecessary "random" audits and complaints, as a licensed behavior health physician, I am speaking up against bullying.

> In the state of Pennsylvania, substance use disorders are managed under behavioral health.  My practice manages both substance use disorders and/or mental health disorders.  Snyder's message to me states that our daughter, cannot be exposed to the "population" which my office, Associates In Medical Toxicology manages.

> As a disclaimer, the business of Healthcare Insurance is not my area of specialty.  Meanwhile, if an insurance executive director has strong negative feelings about the "population" in which they control millions of dollars, my understanding is that it would be a conflict of interest for the employer?  (Especially if the public became aware of this?)

> Has news media, social media, the public, community, etc discovered this which would be unfortunate for CBC?

> Seems like this is the type of material which could destroy personal career in behavior health and the insurance industry?

> I recall Snyder currently works for this "population" so her words seem hypocritical.

> Per her public statement, she has over a decade experience with this "population."

I believe she was awarded Federal and State money to help the "population."

If she feels negatively about the "population" which she was paid $450,000 to manage per year, maybe she applied for the wrong PCCD grant?

She received PCCD funding for multiple years.

The PCCD legal department has been informed multiple times as has DDAP about the necessity for a detailed audit of your executive director's behavior.  PCCD is choosing to ignore Snyder's publicly abandoned grant materials, unpaid invoices, abandoned company materials, etc.  We have photos, videos, invoices and testimony which aligns with my statements.  Both Departments have ignored the recommendation of our legal team, unfortunately.

Snyder currently advertises on psychology today to treat this "population?"

https://www.psychologytoday.com/us/treatment-rehab/renea-snyder-therapy-harrisburg-pa/377160

(Doc. 181-19 (errors and underlining in original).)  Moore attaches to his email an article from Psychology Today; what appears to be a billing/claim statement from Capital Blue Cross to Migliore; a screenshot of Snyder's therapy website; a text message exchange between Snyder and Moore regarding custody of their child; and a screenshot of Migliore's website.  (*Id.*)

With respect to Snyder's claim for trade slander/libel, the court finds that Snyder has failed to produce evidentiary support of a resulting pecuniary loss based on the statements made by Moore.  While Snyder testified that her title was

changed soon after the email from Moore and that her new role was in a less public-facing position, she admitted that her "pay did not change[.]" (Doc. 181-7, pp. 15–16.) Moreover, when Snyder's employment was terminated by Capital Blue Cross, she was told that her discharge was due to a "reorganization of the company." (*Id.* at 15.) There has been no evidence produced indicating that the reason for Snyder's discharge was Moore's statements to Capital Blue Cross. Therefore, summary judgment is not warranted on this claim.

With respect to Snyder's claim for defamation, the court notes that there is no pecuniary loss requirement. A reasonable jury could find that Moore's email to Capital Blue Cross was defamatory in nature, published by Moore, was applicable to Snyder, that Capital Blue Cross understood its defamatory meaning, and that the email was intended to be applied to Snyder. Indeed, a project manager at Capital Blue Cross appeared to believe that Moore's email was "[p]ersonal slander of a CBC employee by a CBC provider." (Doc. 181-19, p. 2.) However, a reasonable jury could also find that Moore's email did not "so to harm the reputation of [Snyder] as to lower [her] in the estimation of the community or to deter third persons from associating or dealing with [her]" because Capital Blue Cross did not fire her, and instead retained her in a different position with no change to her compensation. *Graboff*, 744 F.3d at 135 (quoting 42 PA. CONST. STAT. § 8343(a)). The jury would need to weigh this evidence to determine whether Snyder's

defamation claim against Moore would succeed.  Accordingly, Snyder is not entitled to summary judgment on this claim and her motion will be denied.

## CONCLUSION

For the foregoing reasons, the court will grant in part and deny in part the partial motion for summary judgment.  (Doc. 180.)  An appropriate order will issue.

s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Court Judge
Middle District of Pennsylvania

Dated: March 30, 2022